IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| ROBERT D. RIGGS,<br><br>        Plaintiff,<br><br>    vs.<br><br>WARDEN BERKEBILE, U/M WANDLER, CHIEF BUSBY, LT. WEAVER, C/M GOLD, U/M CHRISTIANS, CHIEF STEWART, DOC MONITOR KENYON, WARDEN FENDER, SGT. MOHART, ASST. WARDEN POWELL, and CCA, CROSSROADS FACILITY,<br><br>        Defendants. | CV 16-00092-GF-BMM-JTJ<br><br><br><br>ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |

Pending before the Court are Defendants' Motions for Summary Judgment (Docs. 58, 62).  On July 27, 2015, Plaintiff Robert Riggs, a state prisoner proceeding without counsel and in forma pauperis, initiated this action by submitting a Complaint and an affidavit of inability to pay filing fees in Toole County against Corrections Corporation of America (n/k/a and referred to herein as "CoreCivic") and a number of employees at Crossroads Correctional Facility (referred to herein as "Crossroads") raising claim of failure to protect and denial of medical care arising from an incident in 2007.  (State Court Case Register, Doc. 5; State Court Complaint, Doc. 6.)  On April 13, 2016, Mr. Riggs filed an Amended

1

Complaint in state court (Doc. 7) raising claims of failure to protect and denial of medical care arising from incidents in 2007 and 2015.  claims.  Defendants CoreCivic and Crossroads received the state court summons and complaint on July 28, 2016 through personal service and on August 16, 2016 filed a Notice of Removal to this Court pursuant to this Court's federal question jurisdiction, 28 U.S.C. § 1331.  (Doc. 1.)  On July 5, 2017, Mr. Riggs filed a Second Amended Complaint (Doc. 9) which is the operative complaint in this matter.

On January 22, 2018, this Court issued an Order and Findings and Recommendation which recommended the dismissal of Mr. Riggs's claims arising from the 2007 incidents but required the CoreCivic Defendants (Defendants CoreCivic, Crossroads, Berkebile, Wandler, Weaver, Gold, Fender, Morhardt, and Powell) to respond to Mr. Riggs' claims arising in 2015.  (Doc. 10.)[1]  Specifically, Defendants Berkebile, Wandler, Busby, Weaver, Gold, Christiaens, Stewart (who has never been served and has made no appearance), Kenyon (referred to herein as "Ms. Alstad"), Fender, Morhardt, CoreCivic, and Crossroads were required to respond to Mr. Riggs's failure to protect and negligence claims arising out of an incident on November 17, 2015.  (Doc. 10 at 1-2).  Additionally, Defendant

---

[1]The Court's January 22, 2018 Recommendation to dismiss claims arising out of the events occurring in 2007 was adopted by Judge Morris on April 16, 2018.  (Doc. 23.)

Powell was required to respond to Mr. Riggs's denial of medical care and negligence claims. *Id.* On February 12, 2018, the CoreCivic Defendants filed an Answer to the Second Amended Complaint. (Doc. 11). Ms. Alstad filed an Answer to the Second Amended Complaint on April 26, 2018. (Doc. 26.)

Defendant Stewart has never been served and should be dismissed for failure to serve pursuant to Rule 4 of the Federal Rules of Civil Procedure. (*See* Doc. 45, USM 285 Return–summons returned unexecuted.) In addition, in his response to Defendants' Motion for Summary Judgment, Mr. Riggs concedes that A/W Powell should be dismissed. (Doc. 73 at 2.) As such, the only remaining claims are Mr. Riggs's failure to protect and negligence claims arising out of the incident on November 17, 2015 as raised against Defendants CoreCivic, Crossroads, Berkebile, Wandler, Weaver, Gold, Fender, Morhardt, and Alstad.

Having considered the parties' arguments and submissions, the Court finds there are genuine disputes as to material facts regarding the merits of Mr. Riggs's claims. Defendants CoreCivic, Crossroads, Berkebile, Wandler, Weaver, Gold, Fender, Morhardt, and Alstad's motions for summary judgment should be denied.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a).  Under summary judgment practice,

"[t]he moving party initially bears the burden of proving the absence of a genuine

issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.

2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving

party may accomplish this by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials" or by showing that such

materials "do not establish the absence or presence of a genuine dispute, or that

the adverse party cannot produce admissible evidence to support the fact."  Fed. R.

Civ. P. 56(c)(1)(A), (B).

    "Where the non-moving party bears the burden of proof at trial, the moving

party need only prove that there is an absence of evidence to support the non-

moving party's case."  *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at

325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  If the moving party meets its initial

responsibility, the burden then shifts to the opposing party to establish that a

genuine issue as to any material fact actually does exist.  *See Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In attempting to

establish the existence of this factual dispute, the opposing party may not rely

upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the

opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

By notices provided on March 21, 2019 and March 29, 2019 (Docs. 61, 69), Mr. Riggs was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II.  FACTS

As set forth above, Mr. Riggs's claims arising in 2007 were dismissed as time-barred (Doc. 23) but the factual basis of those claims gives context to Mr.

Riggs's claims arising in 2015 and therefore is set forth herein.

Mr. Riggs alleges he was assaulted by "the white boys" several times while housed in C-Pod at Crossroads in 2007.  (Amd Compl. Doc. 9 at 2; Riggs's Statement of Disputed and Undisputed Facts, Doc. 74 (hereinafter "SDF" at 2, ¶ 3.).  He claims that he repeatedly asked to be moved but because he did not tell staff the names of the inmates that were assaulting him, he was not moved.  He was assaulted on April 4, 2007 by two inmates and his lower jaw was broken.  He was eventually transferred to Montana State Prison.  (Second Amd. Cmplt., Doc. 9 at 2-4.)

On March 24, 2015, Mr. Riggs was transferred back to Crossroads from Montana State Prison by the Montana Department of Corrections.  (CoreCivic Defendants' Statement of Undisputed Facts, Doc. 65 (hereinafter "SUF") at ¶ 7.) When interviewed at Crossroads regarding his housing, Mr. Riggs told Case Manager Gold ("C/M Gold") that he was concerned for his safety if he were housed on D-wing or in C-Pod.  Mr. Riggs claims that C/M Gold acknowledged the threat to Mr. Riggs's safety and placed him in A-pod overnight.  (Second Amd. Complaint, Doc. 9 at 4; Riggs Aff., Doc. 74-1 at 8, ¶ 4.)  He was then moved to E-pod the next morning which is for medium custody offenders.  (SUF at ¶ 8.)

On April 2, 2015, Mr. Riggs came into Defendant Camille Wandler's office

asking about copies.  Ms. Wandler asked Mr. Riggs if he had been in Crossroads in the past.  He replied that he had been in 2006 and 2007.  Ms. Wandler checked Mr. Riggs's information in the computer system and noticed that he was a close custody inmate, but was being housed in the E-Pod.[2]  Ms. Wandler asked Mr. Riggs why he was being housed in the E-Pod, and he responded that he was medium-1 custody, which was not true.  Ms. Wandler responded and told him that the computer system showed that the Department of Corrections had him classified as close custody.  (SUF at ¶ 9.)

Mr. Riggs told Ms. Wandler that he could not go to the C-Pod because he had previously been assaulted there.  He claims he told Ms. Wandler that if he was housed on C-Pod he would be assaulted by the same group of inmates that assaulted him in 2007.  (SDF at ¶ 3.)  Ms. Wandler asked Mr. Riggs several questions to determine if there was a current need for separation from other inmates in the C-Pod.  (SUF at ¶ 10.)  Ms. Wandler asked Mr. Riggs who

_____

[2]"Close custody" is the "highest custody level in general population as determined by the prison's objective classification system.  Inmates classified to this level pose a threat to the safety and security of the facility, staff, and other inmates and the public. These inmates require additional adjustment, severity of offense, and sentence length. They may be housed in the High Security Compound." (SUF at ¶ 28 citing MSP Procedure 4.2.1(III)(B)(3)(d)).  At Crossroads, close custody inmates are housed in the C-Pod and in certain cases, close custody inmates may also be housed in the Restricted Housing Unit ("RHU"), which is also referred to as segregation.  (SUF at ¶ 30.)

assaulted him in 2007 and Mr. Riggs told her it was Inmate Willis. Ms. Wandler

informed Mr. Riggs that Inmate Willis was no longer at Crossroads. Mr. Riggs

stated that he would not give names of the inmates who assaulted him in 2007 but

then he identified two other inmates, Blinky and Cheeseburger, who were part of

the assault. Ms. Wandler recognized these nicknames as two inmates, Mr.

Kauffman and Mr. Hale. Ms. Wandler testified that she confirmed these

individuals were no longer housed at Crossroads (SUF at ¶ 11) but Mr. Riggs

disputes this information and testified that Mr. Hale was the inmate who ordered

the assault on him in 2007 and that Mr. Hale lived on C-Pod in March, April, May,

and November 2015 when Mr. Riggs was assaulted. (SDF at ¶ 3; Riggs Aff., Doc.

74-1 at 9, ¶ 6.)

     Ms. Wandler contends that Mr. Riggs also suggested he would have

problems with Inmates Mr. Lamere and Mr. Conley, as well as natives and whites

but he did not provide any other information to specifically identify inmates

currently in the C-Pod who he was afraid of or who had made specific threats

against him. Ms. Wandler testified that she confirmed that Mr. Lamere and Mr.

Conley were not housed in C-Pod. (SUF at ¶ 11.) Mr. Riggs, however, testified

that Mr. Conley and Mr. Lamere were both living on C-Pod at the time. (SDF at ¶

5, Riggs Aff., Doc. 74-1 at 9, ¶ 6.) Mr. Riggs testified that he told Defendants that

the whites, natives, and serenios were a serious risk to his safety if he was forced to live on C-Pod.  (SDF at ¶ 10.)

On April 2, 2015, Ms. Wandler told Mr. Riggs that due to his close custody status, he would need to be housed in the C-Pod.  Mr. Riggs refused and as a result he was written up for violating a direct order.  Three days later he was found guilty of the write-up and sanctioned to 30 days disciplinary detention in the Restricted Housing Unit ("RHU") where he was housed until April 28, 2015. (Second Amd. Complaint, Doc. 9 at 5; SUF at ¶ 18.)

During the time he was in the RHU, Mr. Riggs participated in segregation reviews with Ms. Wandler and other prison officials.  In their motions for summary judgment Defendants represented that at these segregation reviews, Mr. Riggs just stated a general concern for his safety in the C-Pod, did not provide any additional corroborating information, and refused to provide such information when asked to do so.  (SUF at ¶ 19; Alstad Aff., Doc. 60-1 at ¶¶ 17-21; Wandler Aff., Doc. 66 at ¶ 22.)

Mr. Riggs testified that a segregation review was held on April 7, 2015 which was attended by Warden Bekebile, U/M Wandler, Security Chief Busby, Lt. Weaver, C/M Gold, and U/M Christians.  At that review, Mr. Riggs explained the incidents in 2007 and expressed his concern for his safety.  Additional reviews

were held on April 14, 2015, April 21, 2015, and April 28, 2015.  These were

attended by Chief Stewart, DOC monitor Ms. Kenyon (Alstad), and the staff who

attended the April 7, 2015 review.  At all reviews, Mr. Riggs pled his concerns for

his safety.  (Second Amd. Complaint, Doc. 9 at 5-6.)

Mr. Riggs testified that he told Defendants Wandler, Weaver, Berkebile,

Gold, Christians, Busby, Fender, and Alstad several times that Inmate Hale was

part of the assaults perpetrated on him in 2007 and that Hale currently lived on C-

Pod.  Mr. Riggs testified that he explained to Defendants that if he was forced to

live on C-Pod he would be assaulted again and that he had been assaulted several

times on C-Pod by multiple people because of his status as a sex offender.  He

testified that he provided Defendants with the names and identified the groups of

inmates that posed a threat to his safety that lived on C-Pod currently and that they

were the same individuals and groups that assaulted him in 2007.  (Riggs Aff.,

Doc. 74-1 at 9, ¶ 11, 12.)  Mr. Riggs testified that he told Defendants that the same

groups and named inmates responsible for his assault in 2007 were still living on

C-Pod and if housed on C-Pod he would suffer at the hand of the STG groups.

(Riggs SUF, Doc. 74 at 3, ¶ 11.)  He told them that it was common knowledge that

all sex offenders forced to live on C-Pod are the target of violence.  (Riggs SUF,

Doc. 74 at 3, ¶ 11.)  Mr. Riggs personally witnessed many inmates convicted of

11

sex offenses reclassed off C-Pod for their own safety but he also witnessed Crossroads staff write up many sex offenders and force them to live on C-Pod where they were the target of violence.  (Riggs Aff., Doc. 74-1 at 9, ¶ 10.)

Despite his pleas, Mr. Riggs was ordered to be housed on C-Pod.  He was told that if he refused he would be written up every seven days until his classification points were max points.  He was also told that staff would take all his bedding from 6:00 a.m. to 10:00 p.m. each day.  Mr. Riggs wrote a notification dated April 28, 2015 putting Crossroads staff on notice of the danger to his person. (Second Amd. Complaint, Doc. 9 at 5-6; Notification, Doc. 9-1 at 32.)

In a recorded telephone call on April 17, 2015, Mr. Riggs told his mother that prison officials were willing to put separation needs on him but only if he identified the person(s) who he needed to be separated from.  Mr. Riggs told his mother that he would not be a "rat" and tell on anyone.  In an April 22, 2015 call, Mr. Riggs discussed with his mother that the prison officials would not know who to provide a separation need for if he did not tell them.  They specifically discussed that if he provided a name, then prison officials could place a separation need and tell Montana State Prison that they could not keep Mr. Riggs at Crossroads or move the other person with whom he had a potential conflict.  (SUF at ¶ 14.)  Mr. Riggs told his mother that the person who had previously assaulted

12

him in 2007 was no longer in C-Pod at Crossroads, to which his mother

responded, "Well, maybe you won't have a problem."  Mr. Riggs then explained,

"I'm telling you right now that the dude, the dude that was behind it all, is still in

there.  He's still there right now.  I mean he's the one that was sending them all."

(April 17, 2015 transcript, Doc. 66-5 at 7.)  Mr. Riggs then said,

> But, and then they're like we want to know the name, we want to
> know the group of people, we want to put separation needs on them.
> And I said, dude, you do that, then they're gonna find out, they're
> going know that I got, needed a special separation needs on them.
> Then they're gonna go tell everybody and then everybody is going to
> look at me like I'm a friggen rat and I ain't doing that.  Ain't
> happening.

(April 17, 2015 transcript, Doc. 66-5 at 8.)

On April 29, 2015, Mr. Riggs was moved from the RHU to the C-Pod where

he was housed in four different cells (110, 112, 207 and 208) until November 17,

2015.  (SUF at ¶ 20.)  Mr. Riggs testified that after he was moved to C-Pod he was

subjected to several threats and harassment over the next few months.  He testified

that he was also extorted out of hundreds of dollars which he paid for protection.

He explained in his Second Amended Complaint that in November 2015 he ran

out of money.  (Second Amd. Complaint, Doc. 9 at 7.)

Mr. Riggs testified that he spoke to U/M Christians multiple times between

May 2015 and November 2015 about threats, extortions, and threats of assault if

13

he was not moved off C-Pod.  He told her of the risk to his safety and she told him

that she would re-class him off C-Pod but she never did.  (Riggs Aff., Doc. 74-1 at

10, ¶ 14.)  He testified that he also spoke with Warden Berkebile several times

between May 2015 and November 2015 about concerns for his safety and the

threats and the Warden's response was always, "I'll look into it" but he never did.

(Riggs Aff., Doc. 74-1 at 10, ¶ 15.)  After Mr. Riggs's cellmate James Pool was

moved in November and Simon Jacobson was taken to the RHU unit, Mr. Riggs

testified that he was under constant threat of assault and he spoke to U/M

Christians several times and she promised she would get him off the block but she

didn't.  (Riggs Aff., Doc. 74-1 at 10, ¶ 16.)

Mr. Riggs testified that on November 16, 2015, Ed Gogg, a known white

supremacist who had just been disciplined for assaulting a sex offender was

moved into his cell.  (SDF at 3, ¶ 17; Riggs Aff., Doc. 74-1 at 11, ¶ 11.)  On

November 17, 2015, inmates in "said group" went to the library and pulled Mr.

Riggs's case off of Nexis/Lexis.  At 11:00 a.m., the leader of "said group" told Mr.

Riggs to pack his things and leave the block or suffer assault.  Mr. Riggs testified

that on November 16 and again on November 17 he spoke to U/M Christians, told

him of the threats and she told him to "deal with it."  (Riggs Aff., Doc. 74-1 at 11,

¶ 19.)

14

At approximately 4:30 p.m. on November 17, 2015, Mr. Riggs was assaulted in his cell by Inmate English and Inmate Devine.  During the investigation into this assault, prison staff also identified Inmate Wassmer as a participant in the assault.  Mr. Riggs had never specifically identified these inmates as a threat or persons from which he required separation.  Ms. Wandler testified that she was not aware of any facts prior to the November 17, 2015 assault from which she could have determined Mr. Riggs had a need for separation from Inmates Wassmer, Devine or English.  (SUF at ¶ 21.)

## III.  DISCUSSION

### A.  Eighth Amendment Failure to Protect–Individuals

"Prison officials have a duty to take reasonable steps to protect inmates from physical abuse." *Hoptowit v. Ray*, 682 F.2d 1237, 1250-51 (9th Cir. 1982); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Robinson v. Prunty*, 249 F.3d 862, 866 (9th Cir. 2001).  In particular, prison officials have an affirmative duty to protect inmates from violence at the hands of other inmates.  *Farmer*, 511 U.S. at 833.

The failure of a prison official to protect inmates from attacks by other inmates or from dangerous conditions at the prison violates the Eighth Amendment only when two requirements are met:  (1) the objective

15

component—the deprivation alleged must be sufficiently serious, and (2) the subjective component—the prison official must possess a sufficiently culpable state of mind. *Farmer*, 511 U.S. at 834 (*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The inmate may satisfy the "sufficiently serious" requirement by showing the existence of "conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993). "The objective question of whether a prison officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact, and as such must be decided by a jury if there is any room for doubt." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075–76 (9th Cir. 2013) (citation omitted).

To meet the subjective component, a prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *See Farmer*, 511 U.S. at 834. This second step involves a two-part inquiry. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). First, a prison official can be held liable under the Eighth Amendment for failing to guarantee the safety of a prisoner if they know of and disregard an excessive risk to an inmate's health or safety. *See Farmer*, 511 U.S. at 837. This part of the inquiry "may be satisfied if the inmate shows that the risk posed by the deprivation is obvious." *Thomas,* 611 F.3d at 1150. The official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference. *See Farmer*, 511 U.S. ast 837.

> The standard does not require that the guard or official " 'believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur.' "

*Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (*quoting State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983)). Advance notification is not a necessary element of an Eighth Amendment failure-to-protect claim. *Farmer*, 511 U.S. at 849. Prison officials do not escape liability if the evidence shows that they "merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Id.* at 843 n.8.

Second, "the inmate must show that the prison officials had no 'reasonable' justification for the deprivation, in spite of that risk." *Thomas*, 611 F.3d at 1150-1151. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably." *Farmer*, 511 U.S. at 844.

Deliberate indifference describes a state of mind more blameworthy than negligence. *See Farmer*, 511 U.S. at 835 (*citing Estelle*, 429 U.S. at 104). Neither

negligence nor gross negligence will constitute deliberate indifference.  *See Farmer*, 511 U.S. at 835–36 & n. 4; *see also Estelle*, 429 U.S. at 106 (establishing that deliberate indifference requires more than negligence).

Mr. Riggs's failure to protect claim appears to be based upon three theories. First, is the idea that Mr. Riggs notified Defendants that he had been assaulted in C-Pod in 2007, the inmates responsible were still in C-Pod, and he was therefore concerned for his safety.  Secondly, Mr. Riggs alleges that Crossroads staff had knowledge of an obvious risk to sex offenders if housed on C-Pod and they recklessly disregarded that risk.  Third, Mr. Riggs contends a prison official labeled him in such a way as to increase his risk of assault.  (Second Amd. Complaint, Doc. 9 at 12.)

### 1.  Specific Threat

One way to establish a failure to protect claim is to demonstrate that a defendant disregarded evidence of a specific threat.  Mr. Riggs argues he advised Defendants that he had been assault in C-Pod in 2007 and some of the same inmates who had been responsible for that assault were still housed in C-Pod. There is a genuine issue of material fact regarding what information Mr. Riggs provided to Defendants prior to the assault.  For example, Ms. Alstad stated in her Answer and her Initial Disclosure Statement that she did not recall whether she

attended the classification or segregation reviews involving Mr. Riggs on April

21, 2015 and April 28, 2015.  (Answer, Doc. 27 at 4, para 10; Initial Disclosure,

Doc. 28 at 3.)  Similarly in discovery responses, the CoreCivic Defendants each

indicated they had no recollection of attending the segregation reviews Mr. Riggs

listed in his Complaint.  (Discovery Responses, Doc. 74-1 at 20, 23, 27, 33, 68.)

When asked what was discussed in the segregation reviews, Defendants indicated

they could not recall.  (Interrogatory Req. #4 Response, Doc. 74-1 at 42.)  Further

although segregation reviews are generally documented, Defendants were unable

to locate any documentation from the segregation reviews listed in Mr. Riggs's

pleadings stating that the documents were likely discarded in accordance with

Crossroads' document retention policy.  (Doc. 74-1 at 41-42.)

Yet in the motions for summary judgment, Defendants testified to and

argued about the substance of those segregation reviews.  Ms. Alstad directly

contradicts the information provided in her Answer and says she recalls attending

a segregation review involving Mr. Riggs in April, 2015 and during this review

Mr. Riggs claimed that he could not be housed in C-Pod due to his fear of being

attacked but he refused to provide the names of the individuals whom he feared

would attack him and only spoke vaguely about alleged groups of people whom he

feared would attack him.  (Alstad MSJ brief, Doc. 59 at 3 *citing* Alstad Aff. at ¶

11, 16, 19, 20.)

Similarly, Ms. Wandler responded to discovery that she did not recall whether she attended the segregation reviews at issue.  (Doc. 74-1 at 27.)  Yet in her affidavit filed in support of Defendants' Motion for Summary Judgment she testified that Mr. Riggs participated in segregation reviews with herself and other prison officials but that he only stated a general concern for his safety and did not provide any additional corroborating information and refused to provide such information when asked.  (Wandler Aff., Doc. 66 at 8, ¶ 22.)

Mr. Riggs asks in his response brief:  "How can this Court rely on this sworn statement when in another sworn statement she states the exact opposite." (Doc. 73-1 at 5.)  The Court wonders the same.  Regardless, at this stage in the litigation, the Court must take the facts in the light most favorable to Mr. Riggs. As such, the Court finds for purposes of these motions that Mr. Riggs told Defendants Wandler, Weaver, Berkebile, Gold, Christians, Busby, Fender, and Alstad several times that Inmate Hale was part of the assaults perpetrated on him in 2007 and that Mr. Hale live on C-Pod, that Mr. Riggs told them that if he was housed on C-Pod he would be assaulted again, that he had been assaulted several times on C-Pod by multiple people because of his status as a sex offender, and that he provided the names and identified the groups of inmates that posed a threat to

his safety that lived on C-Pod currently and that they were the same individuals

and groups that assaulted him in 2007.  (Riggs Aff., Doc. 74-1 at 9, ¶ 11, 12;

Riggs SUF, Doc. 74 at 3, ¶ 11.)

Further while Defendant Wandler testified that she checked to see if the

inmates named by Mr. Riggs were present in C-Pod, Mr. Riggs testified that all

three inmates listed in Ms. Wandler's April 2, 2015 incident report (Conley, Hale,

and Lamere) lived on C-Pod at relevant times.  (SDF at ¶ 5.)  In addition,

Defendants refused to produce the segregation inmate rosters or the C-Pod inmate

rosters to Mr. Riggs.  (Req. for Prod. #10, 11 Response, Doc. 74-1 at 46-47.)

Defendants objected on the grounds that the requests were overly broad, not

reasonably calculated to lead to the discovery of admissible evidence, and not

proportional to the needs of the case.  The Court disagrees.  Defendants also

contend these rosters were not maintained for the length of time requested.  If the

inmate rosters for C-Pod exist for the period of time between May 2015 and

November 2015, those rosters must be produced to the Court and to Mr. Riggs.  If

the rosters are not available, Defendants shall produce any documentation showing

where Inmates Hale, Conley, and Lamere were housed between April 2015 and

November 2015.

## 2. General Threat

Mr. Riggs's second theory of liability is that he was assaulted as a result of prison conditions or practices that are dangerous to all prisoners or to an identifiable groups of prisoners. As set forth in *Farmer*,

> The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

*Framer*, 511 U.S. at 843. Mr. Riggs alleges he was assaulted because the Defendants had knowledge of an obvious risk to sex offenders housed on C-Pod and they recklessly disregarded that risk. He claims he told Defendants that it was common knowledge that all sex offenders forced to live on C-Pod are the target of violence. (Riggs SUF, Doc. 74 at 3, ¶ 11.)

Defendants could be liable if they were deliberately indifferent to a substantial risk of harm caused by housing sex offenders in C-Pod. Mr. Riggs presented affidavits of other inmates that they witnessed the persecution of sex offenders on C-Pod, that they had seen Crossroads staff open cell doors to allow assaults on sex offenders in C-Pod, that all sex offenders have a high probability of being a target of assault if housed on C-Pod, and this was well known by

22

Crossroads' staff.  (Middlemiss Aff., Doc. 74-1 at 13-14.)  Inmate Hallberg even

testified that Crossroads' officers told him that Mr. Riggs was a sex offender and

he should have the "white boys" "deal" with him–meaning hurt him with brutal

assault.  He testified that he was there the night Mr. Riggs was assaulted and the

guard on C-Pod not only knew it was going to happen, but encouraged it to

happen.  Inmate Hallberg claims that he witnessed Crossroads' staff open Mr.

Riggs's locked cell door so inmates could go into his cell and assault him.  He

testified that all sex offenders that are housed on C-Pod are targets of staff and

inmates.  (Doc. 74-1 at 16-17.)

Mr. Riggs sought to discover the number of assaults perpetrated upon sex

offenders in C-Pod and how many inmates had been removed from housing on C-

Pod for their own safety and Defendants refused to produce that information.

(Interrogatory # 8, # 12 Responses, Doc. 74-1 at 47, 49; Request for Production

#13, Doc. 74-1 at 49.)  Defendants objected to producing this information on the

grounds that it was vague, overly broad and unduly burdensome, not reasonably

calculated to lead to the discovery of admissible evidence, and impractical to

obtain.  The Court disagrees.  To the extent that there are any records regarding

the number of assaults on sex offenders in C-Pod for the years 2014 and 2015,

Defendants must produce that information to the Court and Mr. Riggs or explain

23

why such information is not available.

### 3.  Labeled as a Snitch

Mr. Riggs's third theory of liability is that he was labeled by prison officials in such a way as to increase his risk of assault.  Specifically, he alleges C/M Gold was deliberately indifferent when she told another inmate (Simon Jacobson) that Mr. Riggs was written up and refused housing in April 2015 which according to Mr. Riggs caused the already substantial risk to increase.  (Second Amd. Complaint, Doc. 9 at 12.)

Conduct by prison authorities that is "sure or very likely to cause" serious future injury to an inmate may state an Eighth Amendment claim. *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Claims alleging harm to a prisoner's reputation and thereby subjecting the prisoner to retaliation may support a cause of action under section 1983.  *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989) (prisoner's claim that prison officials labeled prisoner a "snitch," thereby subjecting him to retaliation by inmates, was sufficient to allege Eighth Amendment failure to protect claim).

Assuming the facts in the light most favorable to Mr. Riggs, the Court finds that there are genuine issues of material fact regarding (1) whether the individual Defendants placed Mr. Riggs in conditions posing a substantial risk of serious

24

harm and were deliberately indifferent to a serious risk to Mr. Riggs's safety; (2)

whether the individual Defendants were deliberately indifferent to the risks to sex

offenders housed on C-Pod; and (3) whether Mr. Riggs was labeled in such a

manner as to increase his risk of serious harm.  Moreover, given the facts

presented by Mr. Riggs, it was clearly established in 2015 that prison officials had

a duty to protect inmates from a risk of attack by other inmates and could not

ignore the level of evidence at issue in this case.  As such, Defendant Alstad is not

entitled to qualified immunity.  The individual Defendants' motions for summary

judgment on Mr. Riggs's failure to protect claims should be denied.

### B.  Eighth Amendment Failure to Protect–CoreCivic

In *Monell v. Dept. of Social Services of City of New York*, the United States

Supreme Court, announced the following standard governing the liability of a

municipality under 42 U.S.C. § 1983:

> [A] local government may not be sued under § 1983 for an injury
> inflicted solely by its employees or agents. Instead, it is when
> execution of a government's policy or custom, whether made by its
> lawmakers or by those whose edicts or acts may fairly be said to
> represent official policy, inflicts the injury that the government as an
> entity is responsible under § 1983.

436 U.S. 658, 694.  *Monell* involved a municipal corporation, but every circuit to

consider the issue has extended the holding to private companies acting under

25

color of state law such as CoreCivic/Crossroads.  *See Robinson v. City of San Bernardino Police Dept.*, 992 F.Supp. 1198, 1204 (C.D. Cal 1998) (*citing Street v. Corrections Corp. of America*, 102 F.3d 810, 817–18 (6th Cir. 1996)); *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2nd Cir. 1990); *Lux v. Hansen*, 886 F.2d 1064, 1067 (8th Cir. 1989); *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).

As such, CoreCivic/Crossroads' liability under Section 1983 may not be predicated upon a respondeat superior theory of liability.  *Monell*, 436 U.S. at 694. That is, Mr. Riggs's cannot state a federal claim for relief against CoreCivic/ Crossroads just because one of its employees may have violated his federal constitutional rights.  "Under *Monell*, municipalities are subject to damages under § 1983 in three situations: when the plaintiff was injured pursuant to an expressly adopted official policy, a long-standing practice or custom, or the decision of a final policymaker." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013) (quotations omitted).  In the third situation, a municipality can be liable for a single act or decision so long as the person making the decision has "final policymaking authority." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

Mr. Riggs alleges that CoreCivic/Crossroads maintained a classification

policy that housed sex offenders with dangerous inmates including identified STG, that these violent inmates had displayed violence toward sex offenders, that Crossroads and its staff had known for years that sex offenders housed on C-Pod were targets of violent behavior, and they turned a blind eye to it.  (Response Brief, Doc. 73-1 at 12.)  Mr. Riggs testified that it was common knowledge that sex offenders forced to live on C-Pod were the target of violence.  (Riggs SUF, Doc. 74 at 3, ¶ 11.)

Defendants argue that Mr. Riggs's *Monell* claim should be dismissed because there is no law requiring sex offenders to be housed separately from other inmates solely due to their crimes and Montana does not have separate housing for sex offenders rather inmates in Montana are separated based on classification criteria and facts justifying separation needs.  (CoreCivic Brief, Doc. 63 at 27.) While there may not be a law requiring separate housing for sex offenders, a facility cannot just turn a blind eye to a pattern of violence against sex offenders. *See Farmer*, 511 U.S. 825.  Mr. Riggs contends it was well known that sex offenders were mistreated on C-Pod and yet there is no evidence that additional precautions were taken to protect these individuals.  In fact, Mr. Riggs contends an inmate who had just been disciplined for assaulting a sex offender was moved into Mr. Riggs's cell the day before the assault.  He presented affidavits from other

27

inmates that it was well known by Crossroads' staff that sex offenders were targets of violence on C-Pod and that staff was complicit in that violence and may have even encouraged it. (Middlemiss Aff., Doc. 74-1 at 13-14; Hallberg Affidavit, Doc. 74-1 at 16-17.)

Further, Mr. Riggs claimed that Warden Berkebile had an agreement with inmate Simon Jacobson to run the C-Pod to curb violence which Mr. Riggs argues is evidence of Warden Berkebile's knowledge of the constant risk of violence against sex offenders housed on C-Pod. Mr. Riggs has presented sufficient evidence to demonstrate that Warden Berkebile was aware of the significant risk to sex offenders housed in C-Pod and failed to take reasonable measures to abate that risk. The Court will assume for purposes of this Order only that Warden Berkebile was a final policymaker at Crossroads.

Viewing the facts in the light most favorable to Mr. Riggs, the Court finds that Mr. Riggs presented sufficient evidence to create a genuine issue of material fact regarding whether there was a custom and/or practice of housing sex offenders such as Mr. Riggs in unsafe conditions on C-Pod. As such, summary judgment should not be granted to CoreCivic or Crossroads on Mr. Riggs's *Monell* claims.

## C.  Negligence

"Negligence is the failure to use the degree of care that an ordinarily

prudent person would have used under the same circumstance."  *Barr v. Great*

*Falls International Airport Authority*, 107 P.3d 471, 477 (Mont. 2005).  The

common and statutory law of Montana impose a general duty upon every person to

exercise ordinary and reasonable care.

> Except as otherwise provided by law, each person is responsible not
> only for the results of the person's willful acts but also for an injury
> occasioned to another by the person's want of ordinary care or skill in
> the management of the person's property or person except so far as
> the person has willfully or by want of ordinary care brought the injury
> upon the person.

Mont. Code Ann. § 27–1–701.

A cause of action for negligence requires the plaintiff to prove four essential

elements:  "(1) the defendant owed the plaintiff a legal duty, (2) the defendant

breached that duty, (3) the breach was the actual and proximate cause of an injury

to the plaintiff, and (4) damages resulted."  *Peterson v. Eichhorn*, 189 P.3d 615,

621 (Mont. 2008).

Defendants assert that Mr. Riggs's negligence claims fail because they are

not supported by expert testimony.  They argue that under the circumstances of

this case expert testimony is required to establish:  (1) the applicable standard of

29

care Defendants owed to Mr. Riggs; (2) how Defendants breached that standard of care; and (3) how Defendants' conduct caused Mr. Riggs's injuries.

Expert witness testimony is required in certain negligence cases to establish the elements of duty, breach, and causation when those issues are "sufficiently beyond the common experience of the trier of fact and the expert testimony will assist the trier of fact in determining the issue or understanding the evidence." *Dubiel v. Montana Department of Transportation*, 272 P.3d 66, 70 (Mont. 2012); *Tin Cup County Water and/or Sewer District*, 200 P.3d 60, 69 (Mont. 2008) (concluding expert opinion testimony was required where the issues of causation were "beyond the common experience and understanding" of lay jurors).  As the Montana Supreme Court has stated:

> Under Montana law, expert testimony is required to establish the standard of care unless the conduct complained of is readily ascertainable by a layman.  We have reasoned that because juries composed of laymen are normally incompetent to pass judgment on questions of whether "reasonable care" was exercised in undertaking work calling for a special skill, there can be finding of negligence in the absence of expert testimony to support it.

*Brookins v. Mote*, 367 Mont. 193, 292 P.3d 347 (Mont. 2012)(internal citations and quotations omitted).

Individuals who are engaged in a profession and those who undertake work calling for special skill are required not only to exercise reasonable care in the

conduct of their affairs but also must possess a standard minimum of special

knowledge and ability referred to as the "standard of care." *Doble v. Lincoln*

*County Title Co.*, 215 Mont. 1, 4, 692 P.2d 1267, 1268 (1985) (*citing William L.*

*Prosser, Law of Torts*, pp. 161–62 (4th ed., 1971)).  Because the standards of care

applicable in a negligence action against a professional or one involved in a

skilled trade are outside the common experience and knowledge of lay jurors,

Montana law recognizes that expert testimony is required to establish the standard

of care.  This requirement has been extended to negligence actions against medical

doctors, dentists, orthodontists, veterinarians, lawyers, manufacturers of

pharmaceuticals, abstractors of title, and professional counselors.  *Carlson v.*

*Morton*, 229 Mont. 234, 239, 745 P.2d 1133, 1136–1137 (1987); *Newville v.*

*Department of Family Services*, 267 Mont. 237, 257, 883 P.2d 793, 805 (1994)

(professional counselors); *Zimmerman v. Robertson*, 259 Mont. 105, 107–08, 854

P.2d 338, 339–340 (1993).

Defendants cite to *McCreary v. Corrections Corporation of America*, DV-

08-001 at 4 (Mont. 9th Jud. Dist. Ct. Apr. 11, 2011)(Doc. 63-1) for the proposition

that expert testimony is required in a negligence failure to protect claim, and

specifically inmate classification and separation needs, to establish the

standard of care for prison officials.  *See McCreary* at 4-6.  Further, the Court

reached a similar decision in *Hall v. Kirkegard*, 2017 WL 8787176, **13-14, 2017

U.S. Dist. LEXIS 217008, **36-43 (D.Mont. Jul. 31, 2017), adopted in full by

2018 U.S. Dist. LEXIS 20213 (February 7, 2018).  In *Hall*, this Court found that

while some negligence claims against prison officials may not require expert

testimony, a challenge to the propriety of Defendants' housing policies, the

policies and practices for selecting housing assignments for inmates, particularly

STG inmates, the rationale of dealing with STG inmates, the implementation of

the CCMP program, the movement of inmates, and investigating STG issues were

outside the common understanding of jurors.  *Id.*

Mr. Riggs's allegations, however, differ from the *Hall* and *McCreary* cases.

At issue is not just the separation and classification of Mr. Riggs.  He has

presented evidence that he was assaulted in 2007, that the inmate who ordered the

assault was housed in C-Pod in 2015, that he repeatedly notified Defendants of

this, and that Defendants were well aware of the dangers faced by sex offenders on

C-Pod.  There is even testimony that Crossroads' staff were not just complicit in

the risks faced by Mr. Riggs but encouraged and participated in the acts of

violence.  The Court found in *Hall* that "[s]ome negligence claims against prison

officials may not require expert testimony."  *Hall*, 2017 U.S. Dist. LEXIS 217008

at *41.  This is one such case.  Defendants are not entitled to summary judgment

on Mr. Riggs's negligence claims.

Based upon the foregoing, the Court issues the following:

## ORDER

On or before September 13, 2019, the CoreCivic Defendants shall produce to Mr. Riggs and the Court the inmate roster for C-Pod from April 2015 - November 2015, if that is not available they shall produce documentation showing the location of Inmates Hale, Conley, and Lamere from April 2015 to November 2015, and a list of assaults in C-Pod for the years 2014 and 2015 involving sex offenders.  If such information is not available, Defendants shall file a notice explaining the unavailability and/or destruction of such evidence including an explanation of Crossroads' documentation retention policy.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  Defendant Stewart should be DISMISSED WITHOUT PREJUDICE for failure to serve pursuant to Fed.R.Civ.P. 4.

2.  Defendant Powell should be DISMISSED pursuant to Mr. Riggs's concession that dismissal is appropriate (Doc. 73 at 2.)

3.  Defendant Alstad's Motion for Summary Judgment (Doc. 58) should be DENIED.

4.  Defendants CoreCivic, Crossroads, Berkebile, Wandler, Weaver, Gold, Fender, and Morhardt's Motion for Summary Judgment (Doc. 62) should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[3]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 7th day of August, 2019.


   */s/ John Johnston*
   John Johnston
   United States Magistrate Judge

---

[3]Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)."  Therefore, since Mr. Riggs is being served by mail, he is entitled an additional three days after the period would otherwise expire.